<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

—————————————————————————
                              :
UNITED STATES OF AMERICA,       :       Criminal Case No. 12-318(FSH)
                              :
                              :
          v.                   :       <u>OPINION</u>
                              :
JOSEPH BIGICA,              :       January 10, 2013
                              :
                  Defendant.      :
—————————————————————————:

**<u>HOCHBERG, District Judge</u>**

On May 9, 2012, Joseph Bigica pled guilty to a two-count Information, charging him with, in Count One, corruptly interfering with the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a), and in Count Two, conspiring to violate the Federal Election Campaign Act through the use of straw contributions to a federal election campaign, contrary to 18 U.S.C. § 371.[1]

---

[1]  Count One charged that, from on or about April 15, 2000 to in or about September 2011, in the District of New Jersey and elsewhere, Bigica corruptly obstructed and impeded, and endeavored to obstruct and impede, the due administration of the internal revenue laws of the United States through various means, in violation of Title 26, United States Code, Section 7212(a) and Title 18, United States Code, Section 2.  Count Two charged that, from in or about April 2005 to in or about May 2009, in the District of New Jersey, and elsewhere, Bigica did knowingly and intentionally conspire with others to: (a) knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating more than $10,000 in calendar year 2005, in violation of Title 2, United States Code, Sections 437g(d)(1)(D)(i) and 441f; (b) knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating $25,000 and more in calendar year 2006, in violation of Title 2, United States Code, Sections 437g(d)(1)(A)(i) and 441f; (c) knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating more than $10,000 in calendar year 2007, in violation of Title 2, United States Code, Sections 437g(d) (1)(D)(i) and 441f; and (d) knowingly and willfully make contributions to a candidate for federal office in the names of other persons, aggregating $2,000 and more in calendar year

I.     BACKGROUND [2]

A.     *Bigica's Corrupt Scheme to Obstruct and Impede the IRS*

For calendar years 1999 through 2006, Bigica had gross income totaling approximately $5,801,888, on which approximately $1,488,020 in taxes were due.  Despite earning sufficient income to trigger his legal duty to file Individual Tax Returns for each calendar year 1999 through and including 2006, Bigica did not timely file such tax returns and failed to pay taxes for such calendar years when due, as he was legally obligated to do.

On July 9, 2007, the Internal Revenue Service ("IRS") issued two letters to Bigica (the "July 9, 2007 IRS Notification Letters"), notifying him that the IRS had no record of receiving his 2003 and 2004 Individual Tax Returns, respectively, and that, based upon Bigica's income as reported by third-parties identified in the notification letters, the IRS had computed a total amount of tax due from Bigica of approximately $60,968 (for calendar year 2003), and approximately $238,449 (for calendar year 2004). [3]

On September 24, 2007, after the IRS issued the July 9, 2007 IRS Notification Letters, Bigica transferred ownership of the Franklin Lakes property from himself, his spouse, and his mother solely to his spouse, Laura Bigica, in return for $1.

On the dates listed below, and subsequent to the July 9, 2007 IRS Notification Letters, Bigica filed with the IRS Individual Tax Returns for the calendar years identified below, which

---

2009, in violation of Title 2, United States Code, Sections 437g(d)(1)(A)(ii) and 441f, in violation of Title 18, United States Code, Section 371.

[2]  The following recitation of relevant facts in this action has been taken from the Presentence Investigation Report, ¶¶ 13-65, which the Court expressly adopted in Court on December 11, 2012.

[3]  The two aforementioned IRS Notification Letters were among several ultimately sent to the defendant, advising him of his failure to file Individual Tax Returns for various tax years, and of his failure to pay taxes owed.

stated that Bigica's gross income and taxes owed for such calendar years were the approximate amounts set forth below, totaling $8,669,196.00 in gross income, upon which $2,198,836.00 tax was owed:

| Filing Date | Calendar Year | Gross Income Reported | Tax Due |
|---|---|---|---|
| 12/8/08 | 1999 | $754,825 | $ 186,696 |
| 12/8/08 | 2000 | $642,080 | $ 232,068 |
| 12/8/08 | 2001 | $844,440 | $ 302,241 |
| 12/8/08 | 2002 | $731,532 | $ 222,020 |
| 2/21/08 | 2003 | $307,665 | $ 69,871 |
| 2/21/08 | 2004 | $664,524 | $ 123,967 |
| 5/29/08 | 2005 | $1,086,845 | $ 142,234 |
| 6/20/08 | 2006 | $769,977 | $ 208,923 |
| 10/20/08 | 2007 | $689,180 | $ 204,536 |
| 4/15/09 | 2008 | $1,038,706 | $ 302,630 |
| 10/14/10 | 2009 | $1,139,422 | $ 203,650 |
| | **Totals for Calendar Years 1999-2009** | $8,669,196 | $2,198,836 |

On February 10, 2009, Bigica submitted to the IRS an "Offer in Compromise" as to his tax liabilities for calendar years 1999 through 2008. In that Offer in Compromise, Bigica stated, in pertinent part, that he did not have the ability to pay the outstanding tax liability in full. In

connection with his Offer in Compromise, Bigica submitted to the IRS Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. In that Collection Information Statement, Bigica responded, "No," to the IRS's question, "In the past 10 years, have any assets been transferred by the individual [Bigica] for less than full value?" He had, however, transferred ownership of the Franklin Lakes residence, as detailed above.

Between April 15, 2000 and September 2011, Bigica corruptly obstructed and impeded, and attempted to obstruct and impede, the IRS in performing its lawful functions of ascertaining, computing, assessing, and collecting taxes. To that end, Bigica employed various means to conceal his income and assets, and to prevent the IRS from collecting the taxes he owed to the United States, including conducting personal financial transactions through accounts not held in his own name and making extensive use of a check casher.

Through such corrupt endeavors, Bigica, while not paying his tax liability to the United States and claiming to the IRS that he did not have the ability to pay that outstanding tax liability in full, enabled himself to lead an extravagant lifestyle, spending substantial amounts of money on personal expenses, such as a residence at a club in St. Thomas, United States Virgin Islands (the "St. Thomas residence"); a Lamborghini automobile; a Ferrari automobile; pool service; vacations; and, political campaign contributions, including the reimbursements of unlawful contributions made in the names of other individuals to circumvent the requirements of the Federal Election Campaign Act, as described below.

Between April 2005 and September 2011, Bigica attempted to avoid conducting his personal financial transactions through accounts in his own name, in order to prevent the IRS from identifying his income and assets and seizing accounts held in his name to satisfy his tax liability to the United States.

Between March 2006 and March 2011, Bigica used bank accounts in the names of the Bigica Companies to pay for personal expenses including, but not limited to:

(a) Approximately $781,123 in mortgage payments for the Franklin Lakes property;
(b) Approximately $88,904 for a Lamborghini automobile;
(c) Approximately $73,530 in payments related to the St. Thomas residence;
(d) Approximately $70,725 to jewelers;
(e) Approximately $60,348 for a Ferrari automobile;
(f) Approximately $12,045 for pool service; and,
(g) Political contributions including check payments from an account in the name of one of the Bigica Companies to reimburse unlawful federal campaign contributions, as discussed below.

Between April 2005 and November 2009, Bigica used a bank account in his wife's name to deposit proceeds of the Bigica Companies and to pay for personal expenses including, but not limited to, the following:

(a) Approximately $65,700 in mortgage payments for the Franklin Lakes property;
(b) Approximately $11,382 for a Lamborghini automobile;
(c) Approximately $4,000 for a Ferrari automobile; and,
(d) Political contributions including check payments from his spouse's account to reimburse unlawful federal campaign contributions, as discussed below.

Between April 2007 and August 2011, Bigica used credit card accounts in the names of others, including an employee of the Bigica Companies and that employee's spouse, to pay for his own personal expenses including, but not limited to, approximately $91,743 from 2008 to 2011, for vacations, and approximately $4,600 for unlawful federal campaign contributions, as discussed below.

Between July 2004 and September 2011, Bigica cashed approximately 241 checks totaling approximately $2,513,887, which were payable to himself; the Bigica Companies; Open MRI & Imaging of Newark, PA ("Open MRI"), a company with which Bigica was affiliated; and others, at a check cashing establishment located in Jersey City, New Jersey.

B. *Conspiracy to Violate the Federal Election Campaign Act*

At times during the commission of the instant offense, Committee A served as the principal campaign committee for an individual who was a candidate for federal office. Committee A was renamed Committee B, which served as the principal campaign committee for the same individual who became a candidate for another federal office. Committee A and Committee B (collectively, the "Committee") were authorized to receive contributions and make expenditures for this federal candidate. Furthermore, as the principal campaign committee for this federal candidate, the Committee was subject to the reporting provisions and campaign financing limitations and prohibitions of the Federal Election Campaign Act ("FECA").

The Federal Election Commission (the "FEC") was an independent regulatory agency established to administer and enforce FECA. FECA limited the sources and amounts of contributions used to finance federal elections and required public disclosure of campaign finance information. FECA also governed the making and reporting of contributions to federal candidates and specifically:

(1) limited the amount of contributions from individuals to federal candidates;
(2) prohibited contributions by one person in the name of another person ("Straw Contributions"); and,
(3) required a political committee authorized by a federal candidate to file periodic reports with the FEC identifying each person who made a contribution during the reporting period that exceeded $200.

Specific provisions of FECA further governed the making and reporting of campaign contributions and included the following provisions:

(1) The maximum individual contribution (per election) allowed by law to any federal candidate or his or her authorized political committee was $2,100 for the calendar years 2005-2006, $2,300 for calendar years 2007-2008, and $2,400 for calendar year 2009;
(2) It was unlawful to make contributions in the name of another person or knowingly permit one's name to be used to effect such contributions (the person in whose name such a contribution is made is known as a "Straw Contributor");

(3) The Committee was required to have a treasurer who had to make a written record of all funds received as contributions to the political committee and to authorize all expenditures;

(4) The Committee, by its treasurer, was required to file quarterly reports and pre-election and post-election reports with the FEC identifying each person who made a contribution during the reporting period whose contributions or contributions for that election cycle aggregated to over $200; and,

(5) The FEC was responsible for providing accurate information to the public about the amounts and sources of campaign contributions. These quarterly reports were used to administer and enforce FECA.

Despite these regulations, Bigica circumvented FECA's limits on the amount of money an individual could lawfully contribute to a federal candidate by having Straw Contributions made to the Committee in the names of Straw Contributors who were unlawfully funded and reimbursed by Bigica. Between 2006 and 2009, Bigica made $98,600 in illegal campaign contributions over the course of more than 30 transactions using straw donors, whom he reimbursed. Bigica's insurance business profited from the brokerage of health insurance plans to, *inter alia*, municipalities governed by politicians. However, Bigica was not charged with any actual quid pro quo for his federal election unlawful donations.[4]

## II.     THE PRESENTENCE REPORT

A Presentence Report ("PSR") was prepared and submitted to the Court on October 23, 2012. With respect to Count One, Corrupt Interference with Administration of the Internal Revenue Laws, the PSR states that the base offense level is 22 because the offense resulted in a tax loss of more than $1 million but less than $2.5 million (specifically $2,141,836). PSR ¶ 68, *see* U.S.S.G. § 2T4.1. With respect to Count Two, Conspiracy to Violate the Federal Election Campaign Act, the PSR calculated the base offense level at 8 and increased 8 levels because the offenses involved more than $70,000 but less than $120,000. PSR ¶¶ 70-71, *see* U.S.S.G. §§

---

[4] Prior to the federal election donation scheme, Bigica had for years made substantial political contributions on the municipal level.

2C1.8(a) and 2C1.8(b)(1).  Two more levels are added because Defendant engaged in more than

30 illegal transactions.  PSR ¶ 72, *see* U.S.S.G. § 2C1.8(b)(4).  Four levels were added because

Bigica acted as the organizer/leader of the criminal activity.  PSR ¶ 73, *see* U.S.S.G. § 3B1.1(a).

The PSR also found that Counts 1 and 2 do not group, as they do not satisfy any of the grouping

provisions at U.S.S.G. § 3D1.2, and therefore, a two level increase is warranted under U.S.S.G. §

3D1.4.  PSR ¶¶ 74, 95-99.  The PSR "marginally afforded" the defendant a three level downward

adjustment for Defendant's acceptance of responsibility,[5] based on the plea agreement and

arrived at a final adjusted offense level of 21.  PSR ¶¶ 78-103.

---

[5]  The PSR states:

> 79.     On August 3, 2012, the defendant submitted the following written
>              statement:
>
> "I make no excuses for my behavior. Although it was not my initial intention to
> engage in illegal behavior, after finding myself in deep financial trouble due to a
> bad business investment I tried desperately to hold my business and finances
> together. To make matters worse, I started drinking, using drugs and gambling
> and spending exorbitant amounts of money to support my erratic and grandiose
> behavior. I say this not to make excuses for myself, but to give you some idea as
> to my state of mind at the time. Soon I was no longer just making bad financial
> decisions, I was impeding the administration of the IRS.
> "I also mistakenly thought that my political contributions and connections
> might indirectly help my business and lead to additional contracts. At some
> point on both my taxes and my political contributions I knowingly crossed the
> line from poor judgment to breaking the law. This something I will regret for
> the rest of my life. In additional to ruining my good name, I have brought shame
> and humiliation to my wife and children, who have done no wrong but will
> suffer nonetheless because of me. I feel so ashamed and guilty every time I look
> at them.
> "I accept full responsibility for my crimes. I am fully committed to paying full
> restitution to the IRS and I await any punishment that the Court deems
> appropriate."
>
> 80.     Based on the limited statements made by the defendant, he is marginally
> afforded an adjustment for acceptance of responsibility pursuant to U.S.S.G. §
> 3E1.1.

Defendant's criminal history computation, as set forth in the PSR, is one. See U.S.S.G.

Chapter 5, Part A. PSR ¶ 114. The PSR found that based on a total offense level of 21 and

criminal history category of I, the advisory guideline range for imprisonment is 37 to 46 months.

PSR ¶ 235.

III.    DISCUSSION

A.    The Process for Determining a Sentence

The United States Court of Appeals for the Third Circuit recently restated the proper

process to be used by a sentencing court post-*Booker*.[6]  *U.S. v. Lofink*, 564 F.3d 232 (3d Cir.

2009). In utilizing this three-step process:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely
> as they would have before Booker[;] (2) [i]n doing so, they must formally rule on
> the motions of both parties and state on the record whether they are granting a
> departure and how that departure affects the Guidelines calculation, and take into
> account our Circuit's pre- Booker case law, which continues to have advisory
> force[; and] (3) [f]inally, they are required to exercise their discretion by
> considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they
> impose regardless whether it varies from the sentence calculated under the
> Guidelines.

*Id.*; *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Accordingly, this Court has

considered each of these three steps in turn in fashioning an appropriate sentence for Defendant.

B.    Guidelines Calculation

The first step in the sentencing process is to determine the proper guideline range for the

defendant's sentence.[7] The PSR correctly calculated a total base and adjusted offense level of 22

for Count One. On Count Two, the PSR properly calculated a base offense level of 8, an

---

[6]  *United States v. Booker*, 543 U.S. 220, 246 (2005).

[7]  With respect to Count One, the guideline section applicable to a violation of 26 U.S.C. §
7212(a) is U.S.S.G. § 2T1.1(a)(1). On Count Two, the guideline section applicable to a violation
of 2 U.S.C. § 437g(d)(1)(A)(ii) is U.S.S.G. § 2C1.8(a).

increase in the base offense level by 8 levels because the value of the illegal transactions totaled $98,600, plus a two level increase because the offense involved more than 30 illegal transactions, and a 4-level increase for Defendant's role as organizer and leader of the straw contribution scheme, which resulted in an adjusted offense level of 22.

1.     *Grouping*

The PSR also correctly analyzed that Count One and Count Two do not group, and therefore, pursuant to U.S.S.G. § 3D1.4, a 2-level increase is warranted.  Defendant argued in his sentencing memorandum, and again at sentencing, that the offenses should be grouped under U.S.S.G. 3D1.2(d) because "the offense level is determined largely on the basis of the total amount of harm" and "both offenses are calculated using the table in U.S.S.G. 2T1.1, which is included in the list under 3D1.2(d) as offenses which should be grouped under this sentencing."[8] Defendant's Sentencing Memorandum at 17.  The Government maintained that grouping was improper for several reasons:  (1) despite what Defendant maintains, the list in 3D1.2 doesn't require grouping simply because an offense is one of the sub-chapters listed as appropriate to consider for grouping; (2) they are not counts involving substantially the same harm, victim or transaction(s); and (3) it is clear that the counts are not of the same general type.  Government's Response to Defendant's Sentencing Memorandum at 1-4.

Grouping is primarily addressed in U.S.S.G. § 3D1.2:

> All counts involving substantially the same harm shall be grouped
> together into a single Group. Counts involve substantially the same
> harm within the meaning of this rule:

---

[8]  As pointed out in the Government's Response to Defendant's Sentencing Memorandum, the argument that both are calculated pursuant to the same table is factually incorrect.  The tax offense in Count One is calculated pursuant to U.S.S.G. §§ 2T1.1 and 2T1.4 while the FECA offense in Count Two is calculated pursuant to U.S.S.G. §§ 2X1.1 and 2C1.8.

(a) When counts involve the same victim and the same act or transaction.
(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
(c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2. The Guidelines list certain offenses that are eligible for grouping under subsection (d), and both of the counts here appear on that list. The notes to the Guidelines indicate that subsection (d) applies when the counts are of the "same general type," and that "same general type" is to be broadly construed. *See* U.S.S.G. § 3D1.2 Application Note 6. The United States Court of Appeals for the Third Circuit Court has advised that "courts must distinguish between occasions when increasing the punishment for an additional count would punish the defendant for conduct taken into account in another count and those occasions when the added counts reflect additional criminal culpability." *U.S. v. Rudolph*, 137 F.3d 173, 180 (3d Cir.1998) (internal quotation omitted). "Although [both] counts are listed in subsection (d) as appropriate for grouping, that inclusion does not mean that the counts must be grouped." *United States v. Seligsohn*, 981 F.2d 1418, 1425 (3d Cir. 1992) (holding that "mail fraud counts" could not be grouped with "tax evasion" counts under subsection (d) because "the tax evasion . . . differed in nature" from and was "not an essential part of or related to" the false claims). Rather, "[c]ounts must be of the same general type before grouping is appropriate." *Id.*

As stated in open court on December 11, 2012, this Court agreed with both the Probation office and the Government that Counts One and Two do not satisfy any of the grouping

provisions at U.S.S.G. § 3D1.2. This Court found that the offenses should not be grouped and that the fact that they were listed under subsection (d) simply meant that those are offenses which could be grouped *if* the counts involved substantially the same harm. The two counts in the instant case involve substantially different harms. There is nothing significant under the law or facts of this case that connects a scheme to conceal, evade and deceive the IRS, with a scheme to make illegal campaign contributions. Counts One and Two are not of the same general type, as required by §3D1.2(d) and Third Circuit law. Accordingly, this Court found that grouping was improper and that the 2-level increase was warranted.

### 2. *Acceptance of Responsibility*

The PSR also "marginally" calculated a 3-level downward adjustment for acceptance of responsibility pursuant to § 3E1.1.[9] As part of the plea agreement in this case, the United States and Bigica have agreed that, by pleading guilty to the offenses with which he was charged, Defendant demonstrated acceptance of responsibility and is therefore entitled to a 2-point offense level reduction pursuant to §3E1.1(a) "*if Joseph Bigica's acceptance of responsibility continues through the date of sentencing*." Plea Agreement, Schedule A, p. 8. Such an agreement to stipulate, however, does not bind the sentencing court, which may reject any or all of the stipulations entered into by the parties. At sentencing, this Court gave notice to counsel that it had grave concerns about whether Bigica's conduct had demonstrated acceptance of responsibility after the date of the plea, noting, inter alia, a concern about lack of candor in his

---

[9] The Court declines to give Defendant the 3-level downward adjustment for acceptance of responsibility because he failed to meet his burden to demonstrate that he has "clearly" accepted responsibility for his offenses. *See* infra.

[10] This is recognized by the language of the plea agreement, signed by the parties: "this agreement to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties." Plea Agreement at 3.

statements to the probation department about his financial condition and his continued choice to

pay for a luxury lifestyle during the many months after entry of his plea, rather than choosing to

commit any of the luxury funding asset toward any restitution.  Therefore, the Court heard

extensive argument on Defendant's request for an offense level reduction for acceptance of

responsibility in order to afford Defendant every opportunity to meet his burden to demonstrate

acceptance of responsibility.  In support of his position that Defendant had demonstrated

acceptance of responsibility, defense counsel argued that: (1) his client is remorseful and has

shed tears because he is so ashamed; (2) before there were any plans to present this matter to a

grand jury, his client had authorized him to engage in negotiations with the U.S. Attorney's

Office; (3) his house is listed for sale; and (4) has undergone some psychotherapy for about three

months prior to sentencing.

Under the Sentencing Guidelines, the offense level may be decreased for acceptance of

responsibility "[i]f the defendant clearly demonstrates acceptance of responsibility for his

offense."  U.S.S.G. § 3E1.1(a).  Comment 3 to Section 3E1.1(a) provides in relevant part that

the:

> [e]ntry of a plea of guilty prior to the commencement of trial combined with
> truthfully admitting the conduct comprising the offense of conviction, and
> truthfully admitting or not falsely denying any additional relevant conduct for
> which he is accountable ... will constitute significant evidence of acceptance of
> responsibility for the purposes of subsection (a). However, this evidence may be
> outweighed by conduct of the defendant that is inconsistent with such acceptance
> of responsibility. A defendant who enters a guilty plea is not entitled to an
> adjustment under this section as a matter of right.

It is the defendant's responsibility to establish by a preponderance of the evidence that he

is entitled to a reduction in his offense level for acceptance of responsibility.  *United States v.*

*Muhammad*, 146 F.3d 161, 167 (3d Cir.1998);  *United States v. Rodriguez*, 975 F.2d 999, 1008

(3d Cir.1992).  A defendant who pleads guilty is not automatically entitled to a reduction in his

offense level for acceptance of responsibility; rather, the sentencing court has an "obligation to assess the totality of the situation in determining whether the defendant accepted responsibility." *United States v. McDowell*, 888 F.2d 285, 293 n. 2 (3d Cir.1989).

After hearing extensive oral argument at sentencing, this Court declined to award Defendant a 3 point reduction for acceptance of responsibility. It was Defendant's burden to clearly demonstrate an acceptance of responsibility and Defendant failed to carry that burden in this case. This Court has not had another defendant in over a dozen years on the bench who has shown this level of continued financial evasion in his representations to the United States Probation Department. Defendant was untruthful, cavalier and evasive to the United States Probation Office regarding his financial status and his ability to pay restitution. In addition, while Defendant stated in his plea agreement his intention to make "full restitution," he failed to pay anything toward restitution during the long interval between the plea and sentencing, despite earning nearly $1,000,000.00 in 2011 and more than $40,000.00 per month for each of the first six months of 2012. And, while earning such huge sums, Defendant continued to pay for lavish luxury expenses of others, including, but not limited to, a monthly mortgage payment of $19,563.00 ($234,756.00 annually) for a mortgage on a home he insists is not his own asset. At sentencing, this Court found that under the totality of the circumstances of this case, Defendant failed to meet his burden to demonstrate clearly that he had accepted responsibility for his offenses. Words alone are not enough here. While Defendant's guilty plea may be some

---

[11] While Defendant's attorney indicated at sentencing that Defendant's house is listed for sale and that this shows an acceptance of responsibility, "his" house has been on the market since 2003. Moreover, Defendant continues to deny that this house is even his asset, and thus when it is put up for sale is of no moment for purposes of acceptance of responsibility. Essentially, counsel argued that the defendant's continued diversion of assets to his wife to pay for the luxury homes that he contends is "her house" will stop once it is sold. This is a most unpersuasive argument.

evidence of his acceptance of responsibility, it, alone, is insufficient to trigger a reduction in the offense level under § 3E1.1(a).  *See United States v. Ofchinick*, 877 F.2d 251, 255 (3d Cir.1989).

The plea agreement in this case stated that "with respect to Count 1, Joseph Bigica agrees to make full restitution for all losses resulting from the offense of conviction or from the scheme, conspiracy, or pattern of criminal activity underlying the offense, to the Internal Revenue Service in the amount of $2,141,836."  Plea Agreement at 3.  Defendant also agreed that he would pay all taxes due for calendar years 1999-2010, along with any penalties owed on those returns.  *Id.* at 4. In the seven months since Defendant plead guilty, Defendant has not paid a dime toward restitution.  In light of the fact that Defendant had an adjusted gross income of $993,548 in 2011 and made over $40,000 per month in the first six months of 2012, and in light of the fact that the principal amount of restitution had been agreed upon in the plea agreement, Defendant certainly could have opened his hefty wallet to begin paying his restitution obligation.  He could have done something to show that this obligation had a higher priority than luxury goods for his family.  Instead, Defendant chose to use his high income to pay leases on three luxury cars for his wife and children.  Rather than meeting his obligation to the United States Government to pay his $2 million income tax arrearage, Defendant instead used the money to continue his lavish lifestyle.  This was a crime motivated by greed and vanity and yet Defendant, until the date of sentencing, continued to live his lavish lifestyle, *e.g.*, leasing luxury automobiles and utilizing an expensive pool service, and depleting his own available assets by diverting money to his wife by paying $19,563.00 a month for a mortgage on a home he contends is not his asset, and thus will claim cannot be seized to pay his restitution or IRS penalties.

---

[12]  Only the amount of interest remains to be determined.

In addition, this Court concluded at sentencing that Defendant failed to be forthcoming with the United States Probation Office about his financial status, and in fact, that he engaged in material misrepresentations to the probation officer about his financial status. This is further strong evidence of an absence of genuine acceptance of responsibility, which must be balanced with all of the other circumstances surrounding a defendant's particular case. Defendant was not compliant with the repeated requests of the United States Probation Office for financial information. Defendant was asked by the probation officer on several occasions to provide his 2011 tax return. Defendant never complied. Finally, on the day before sentencing, when the 2011 tax return had still not been provided, this Court entered an order requiring it to be provided immediately. Only then, did Defendant submit his 2011 tax return revealing his $993,548.00 income. There was planning and logic to Bigica's decision to withhold and obfuscate his financial picture from the probation officer, whom he had tried to convince that he had a net worth of merely $13,910.

This was just one of many instances of Defendant's failure to comply. As set forth in the PSR,

> On August 3, 2012 (the "August 2012 documents"), Bigica submitted personal financial statements, as well as copies of various documents/statements allegedly pertaining to living expenses in connection with the presentence investigation.... On the August 2012 net worth statement, the defendant denied owning or maintaining any securities, life insurance policies, safe deposit boxes/storage facilities, real estate, or having had any business interests in the last three years aside from "Joseph Bigica LLC." Bigica further denied any mortgage loans were owed to him, that there were any "anticipated assets," or any trust assets. He also reported "none" when asked about the transfer of any assets with a fair market value of $500 or more since the date of his arrest for the instant offense. Bigica also responded "none" to the section of the financial statement which asked "Assets You Will Liquidate" in order to satisfy any monetary penalties. A closer review of the aforementioned financial statements and accompanying

documentation revealed any and all information pertaining to his wife Laura, and/or Bigica's dependents, was omitted, such as any information regarding property in Laura Bigica's name and/or under her (and, thus, Bigica's) control. The extraneous documentation submitted by the defendant, apparently in support of living expenses, did not corroborate the expenses itemized on the monthly cash flow statement and included statements for unnecessary monthly expenses (e.g., magazine subscriptions for him and his wife, multiple landscaping services, etc.), outdated invoices, and statements for expenses not itemized by Bigica, as outlined above. Given the incompleteness of the August 2012 financial statements, the defendant was specifically directed to complete a second set of statements in their entirety, and to provide additional documents and information, no later than September 7, 2012. On September 10, 2012, the probation office received from Bigica certain requested documents (the "September 2012 documents"); however, the defendant failed to submit complete, corrected net worth and monthly cash flow statements as requested.

PSR, ¶¶ 160-163.

For example, there were many instances where Bigica was not forthcoming with the probation officer in regards to his finances, and only provided more complete responses once this Court ordered it, as demonstrated in the chart below.

| Financial Information Requested by Probation | Financial Information Provided by Defendant to Probation | Financial Information Provided by Defendant to the Court after Court Order |
| --- | --- | --- |
| Bank Statements: "Most recent back account statements (e.g., checking, savings, credit union, money market, brokerage, Certificate of Deposit, or savings bonds) for a three-month period, along with canceled checks" held individually, jointly, by a spouse or by dependant.<br>a) Convenience checking account held by Joseph Bigica LLC | a) Bigica provided only the first page of monthly statements for the months of January, February, March and | a) The Court received complete bank statements for this checking account for the months of January- |

| | | |
|---|---|---|
| | July 2012. No other months were ever provided. | November, 2012 |
| b) Convenience checking account held by Laura Bigica | b) In August 2012, Bigica never identified any accounts in his wife's name. When Bigica did provide documents to the probation officer in September 2012, he provided only the first page for each of the 6 statements between January 24, 2012 and July 23, 2012. | b) The Court received complete bank statements for this checking account for the period between January 24, 2012 and August 23, 2012. |
| c) Joseph Bigica LLC expense account | c) In August 2012, Bigica submitted only the first page of the July 2012 statement. No other statements related to this account were submitted to probation. | c) The Court received complete bank statements for this account for the period January through October 2012. |
| d) Account for daughter, Sophia | d) Nothing reported or submitted by Defendant to probation at any time regarding bank accounts in his children's name(s) | d) Defendant submitted to the Court 1 statement for this account for the period of December 26, 2011- January 25, 2012. |

| | | |
|---|---|---|
| Securities: "Most recent securities account statements (e.g., brokerage, annuities, life insurance, IRA, KEOGH, 401K, or thrift savings account) for a three-month period" held individually, jointly, by a spouse or by dependant. | | |
| a) JP Morgan account for Sophia Bigica (daughter) | a) Nothing reported in August 2012. In September 2012, Defendant submitted pages 1, 3, 5, 7, 9 (of 10 pages) of 2011 Form 1099. | a) The Court received complete statements for the months of October 2011 through March 2012, and June 30 through July 31, 2012. (Note: Form 1099 NOT submitted). |
| b) JP Morgan account for Biagio Bigica (son) | b) Nothing reported in August 2012. In September 2012, Defendant submitted pages 1, 3, 5, 7 (of 8 pages) of 2011 Form 1099. | b) Full statements submitted to the Court for December 2011 and February 2012. (Note: Form 1099 NOT submitted). |
| c) JP Morgan account for Laura Bigica | c) Nothing reported in August 2012. In September 2012, Defendant submitted pages 1, 3, 5, 7, 9 (of 10 pages) of 2011 Form 1099. | c) Full statements submitted to the Court for October 2011 through March 2012. (Note: Form 1099 NOT submitted). |

The most succinct way to describe Defendant's behavior subsequent to the entry of his guilty plea is that he continued to engage in the same sort of deceptive behavior that resulted in the conviction on both counts in this case. This is not what "acceptance of responsibility" means.

Most disturbing to this Court, after Defendant entered his guilty plea, he continued to take calculated steps to conceal assets from the probation officer, who is an arm of the Court. While in a different context, this mindset is essentially the same mindset as the heartland of the crimes to which he plead guilty. In short, Mr. Bigica has not learned his lesson. His portrayal of his financial assets to the probation department was not complete, was not accurate and was not honest. He claimed a net worth of $13,910, in an absurd and dishonest way. Defendant conveniently omitted everything in his wife's name from his statement of assets even though: (1) he produced the income that was put into his wife's name; (2) he exerts control over those assets; and (3) he uses those assets as a source of funds to pay his luxury expenses. He lists as his sole asset a 1993/94 Chevy Suburban. Yet, he lists as expenses and liabilities the payments for assets as to which he disclaims ownership: three luxury cars, 2 Mercedes and an Audi, for which he makes very hefty monthly lease payments; a $19,563.00 per month mortgage on a home he claims he does not own. He lists an $8,000 "jointly-owned" Rolex watch that he wears as a "joint" asset, but failed to tell the probation department that Bigica and his wife held "private collections" insurance for jewelry in the amount of $141,679, and for "fine arts" in the amount of $48,850. The insurance policy also provided coverage for "blanket items," also classified as "fine arts," in the amount of $180,000. This information was discovered by the probation officer only by reading a fine arts and jewelry rider to Defendant's home owner's insurance policy. In sum, Bigica omitted assets and claimed liabilities connected to assets he disclaimed, all in an effort to appear financially impecunious when he is not.

Taking into account all of Defendant's actions post-plea and all of the unique circumstances in this case, this Court denied Defendant a 2-point offense level reduction. Accordingly, Defendant also was not entitled to a one-level decrease under § 3E1.1(b).

        C.      Departure Motions

By stipulation of the parties, no departure motions were filed. Accordingly, the Court will move onto considering the next step in the *Gunter* analysis.

        D.      Variances

The final step in determining a defendant's sentence is for the Court to consider the factors in 18 U.S.C. § 3553(a) based on the specific circumstances of the case and the defendant,

---

[13] That provision allows such a decrease if a defendant "timely notif[ies] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial." U.S.S.G. § 3E1.1(b). However, as explicitly provided by the Guidelines, because Defendant was not entitled to the two-level reduction for acceptance of responsibility, he was not eligible for the one-level reduction under § 3E1.1(b). *Id.* (one-level reduction only applies if "defendant qualifies for a decrease under subsection (a)").

[14] Section 3553(a) requires consideration of the following factors:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed-
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3) the kinds of sentences available;
    (4) the kinds of sentence and the sentencing range established for-
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-
            (i) issued by the Sentencing Commission ..., subject to any amendments made to such guidelines by act of Congress ...; and
            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; ...

imposing no greater sentence than the maximum statutory penalties provided for the offense.  In considering the § 3553(a) factors, a court need not recite each and every factor, as long as it is clear that they were considered.  *Rita v. United States*, 551 U.S. 338 (2007).

It appeared from Defendant's papers and at sentencing that he sought a variance from the advisory guideline range because: (1) he has a gambling addiction; (2) he had entered into a bad financial deal a decade ago; (3) he needed to pay restitution to the IRS; (4) to avoid unwarranted sentencing disparities; (5) the impact of incarceration on his wife; and (6) that Defendant sought counseling in approximately 12 sessions with Dr. Mark Flood, M.D.

This Court had seriously considered each and every one of the § 3553 factors and after balancing them all, the Court found that while Defendant had some significant character flaws, which led to the commission of the offenses here, he was overall a person of some degree of good character in helping others in need, despite the bad character features discussed above.  His character weighed somewhat on the plus side.

With respect to Defendant's request for a variance because he had 12 sessions with Dr. Flood, the Court notes that Defendant only started seeing Dr. Flood on July 31, 2012, more than two months after his plea was entered, and about four months before sentencing.  Clearly, the

---

(5) any pertinent policy statement-
    (A) issued by the Sentencing Commission ..., subject to any amendments
    made to such policy statement by act of Congress ...; and
    (B) that, except as provided in section 3742(g), is in effect on the date
    the defendant is sentenced[;]
(6) the need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

choice to go see Dr. Flood 12 times was done in anticipation of sentencing. While there was nothing wrong with that, it will be afforded less weight as a result.

The other issues in Defendant's character and characteristics of the crime are overwhelming. It was a very serious crime. The election law goes to the heart of what we are as a nation. We have laws that ban this kind of behavior for a reason. In a democracy an honest election is something of extraordinary value. Defendant's crime was a very serious one, and it was not a victimless crime. The victims here are everybody who is a citizen of this country. Much the same is true for the tax laws. Everybody has to pay their taxes. And when they're caught not paying, there is a consequence. This is not simply non-payment; this case is about corruptly interfering with the efforts of the IRS to enforce the tax laws. Corruptly interfering with the administration of the tax laws is itself a very serious crime.

With respect to his family circumstances, Mr. Bigica says that his wife is somewhat poor in filtering and is repetitive as a result of a car accident 30 years ago. Mrs. Bigica will doubtless

---

[15] While Dr. Flood's report mentions in passing such issues as prior drug use and gambling, neither is persuasive in deciding whether to grant Defendant a downward variance. The drug use, by Defendant's own admission, ended in 2010. With respect to the claimed gambling problem, there has not been any proof of any gambling problem sufficient to explain the failure to pay taxes or reimbursement of illegal campaign contributions. While Defendant may have gambled some, that was not an explanation for, or an excuse for either of Defendant's crimes. There certainly was plenty of other money demonstrated that he used to commit his crime of illegal campaign contributions and to pay for a sumptuous lifestyle. This Court credits the fact that Bigica may have some deep seeded personal issues he needs to address to understand why he values money, greed and vanity so highly. Dr. Flood basically states that in his professional opinion Defendant must learn to live a simple lifestyle characterized by hard work, honesty and meaningful personal relationships. This Court agrees. However, since July when Defendant started seeing Dr. Flood, there has been nothing "simpler" in Defendant's lifestyle that has changed to become that simple life. The honesty hasn't been learned yet. Dr. Flood recommends that Defendant undergo neuropsychological testing to help identify specific emotional issues that can be addressed in corrective psychotherapy, but there has been no actual psychological testing that has identified any significant deficits, either developmentally or emotionally that the Court should be considering for a variance. Therefore, this Court gave some, but minor, credit to the report of Dr. Flood.

miss her husband while he is in jail, because she relies on him for managing the finances of a $3.5 million home and produces a lot of income from his insurance business, and has far more financial savvy than she does. This is not an exceptional or even unusual family circumstance. She has raised two children to adulthood, drives a Mercedes well, manages a very large and elegant home, garden, and pool, and has family close by to help her. The fact that there is a looming argument about Mrs. Bigica's mother's estate when she dies at some time in the future is simply irrelevant.

Finally, deterrence is necessary where a defendant earned millions in income and, even after being caught evading his tax liability, sought to hide his assets from the IRS and instead chose to keep paying for a luxury lifestyle for himself and his family. The § 3553(a) factors do not warrant a variance in this case.

IV.    CONCLUSION

For the reasons set forth above, at sentencing, this Court determined that Defendant's total offense level, using the multiple count adjustment, was 24, with a criminal history category of I. Therefore, the guideline range was 51 to 63 months. Accordingly, this Court determined that a fair and not excessive sentence for Defendant Bigica is a term of imprisonment for a term of 60 months consisting of 36 months on Count 1 and 60 months on Count 2, to be served concurrently, together with such other terms and conditions that were stated at the sentencing hearing on December 11, 2012. This Opinion regarding sentencing shall be attached to and incorporated by reference, in its entirety, into the Statement of Reasons and Judgment in this case.

s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**